NEW YORK LIFE LIFE INS. CO. v. LORD et al.

(Circuit Court of Appeals, Sixth Circuit. February 12, 1900.)

No. 719.

1. CONTRACTS—ACCEPTANCE OF OFFER—APPROVED APPLICATION FOR LOAN.

An application for a mortgage loan made to a life insurance company upon a blank form furnished by the company, when signed by the owners of the property, and indorsed with the approval of the finance committee of the company, who had power to make the loan, constitutes a contract binding on both parties.

2. SAME—AGREEMENT TO MAKE MORTGAGE LOAN—MARKETABLE TITLE.

Defendant contracted with plaintiffs to make them a loan on certain real estate situated in Ohio, the contract in effect requiring a marketable title. The title furnished was approved by the counsel selected by defendant, and the only defect therein appearing was the record of two uncanceled mortgages, one given 49 years and the other 47 years prior to the making of the contract. These mortgages were both held by a banking and trust company, which had become insolvent eight years after the second mortgage, which was for $15,000, was executed; and its affairs were in the hands of an assignee, in process of liquidation, for 30 years. Neither the corporation nor its assignee ever took any steps to enforce the mortgages. On the date of the execution and recording of the second mortgage a cancellation was written upon the record of the first, but not signed. Under the laws of the state, an action upon the notes secured, and also the right to foreclose the mortgages, became barred in 15 years from the maturity of such notes, which date, however, did not appear from either mortgage. Held, that under such statutes, and the general presumption of fact arising after 20 years that a note secured

100 F.—2

by mortgage has been paid, and the mortgage satisfied, the record of such mortgages, under the circumstances shown, did not render the title of plaintiffs unmarketable, so as to justify the defendant in refusing to comply with its contract.

In Error to the Circuit Court of the United States for the Western Division of the Southern District of Ohio.

This is a writ of error to review a judgment recovered by Susan J. Lord, Florence C. Murdoch, Fannie C. Mendenhall, and Morten Carlisle against the New York Life Insurance Company for damages for failure to lend $172,000 to the plaintiffs upon mortgage security at 4½ per cent. Prior to this litigation, on June 27, 1896, the St. Nicholas Hotel property, in Cincinnati, had been sold in pursuance of a decree made in partition by the court of common pleas of Hamilton county, Ohio, and had been bought at such sale by the plaintiffs, some of whom had before owned undivided interests in the property, for the sum of $293,000. The plaintiffs were unable to complete their purchase without borrowing money, and they employed W. T. Buckner, a loan broker, to procure a loan for them. Buckner himself did not succeed, but employed W. E. Hutton & Co. to assist him. In July, 1896, Hutton & Co. wrote to the defendant, offering a loan of $180,000 at 4½ per cent. for five years, secured by first mortgage. A. H. Welch, the second vice president of the company, having learned what the property was, directed Edward I. Devlin, who was in the defendant's employ as appraiser and negotiator of loans, to visit Cincinnati, examine and report on the property and the advisability of making the loan. Devlin did so, and made his report on the character of the property and its value. Devlin recommended the proposed loan for favorable consideration, and suggested that 4¾ per cent. interest be asked. The application for the loan, signed upon a blank prepared by the company, was as follows:

"B. & M. No. —.                                   Cincinnati, 13 July, 1896.

"The undersigned desires to procure a loan of $180,000 at 4½ per cent. interest per annum, for the term of five years, from the New York Life Insurance Company, on first mortgage secured by the bond of the owners, and the following representations are made in order to induce the making of the aforesaid loan on the property shown on the diagram below, and described as follows:

"Location: S. E. Cor. Fourth and Race streets, Cincinnati.

"Distance from corner of the nearest cross street: ——— ft. ——— in. ——— of ———.

"Street No.: ———. Side of street: ——— side.

"Dimensions of ground: 96x150 feet.

"Dimensions of building: ———. Number of stories: ———.

"When built: East build., 1892. Corner building, 1858.

"Building materials: Stone and brick.

"Purposes of use: ——— Hotel ———.

"Value of ground: $400,000.

"Number of apartments: ———.

"Value of buildings: $125,000.

"Average rental for each: ———.

"Annual rent: $20,000. On twenty years lease, made six years ago. Lessees pay taxes, assessments, insurance, and repairs.

"Issued for ———.

"Are you now the actual owner of the property? Yes.

"When was this property purchased and deeded to you? Was inherited in 1863, sold for partition, and bought in by us June 27, 1896, for $393,900.

"Is the property now mortgaged, and for what amount? Yes; for $20,000. Will be canceled and first mortgage given you.

"By whom is the mortgage held at the present time? Widows' Home.

"Has the interest on the same always been paid promptly? Yes.

"Are any taxes or assessments unpaid? No.

"What is the assessed valuation of this property? $284,750.

"The principal and interest of this mortgage will be payable in United States gold coin of the present standard of weight and fineness, at the com-

pany's office in New York City. The loan, when papers are perfected, will be paid to applicant by check of this company on a New York City bank.

"Fire insurance to be effected by, and premiums paid through, a person designated by the company.

"(This application must be signed by the owner of the property.)

"[Signed]　　　　　　　Susan J. Lord.

"Fannie C. Mendenhall.

"Florence C. Murdock.

"Morten Carlisle.

"Applicant's Signature.

"By John Carlisle, Agt.

"Residence: Cincinnati, Ohio.

"Name of Broker:

"⸺⸺⸺,

"Address:

"⸺⸺⸺.

"Meeting of July 21, 1896.　　　　　　　　Loan to mature Jan. 1, 1902.

"Interest payable semiannually on the first days of June and December in each year.

"Approved for $180,000.

"One hundred and eighty thousand dollars, for five years, at 4½ per cent. interest per annum.　　　　　[Signed]　　Woodbury Langdon,

"John Claflin,

"A. H. Welch.

"Finance Committee."

Indorsed on back: "Title approved ready for the money. Applicants desire only $176,000.

"[Signed]　　　　　Harmon, Colston, Goldsmith & Hoadly."

In reply to Devlin's letter recommending the loan, Welch, the vice president, telegraphed, advising Devlin to telegraph Carlisle that he would make the loan at 4¾, adding, however, "that you are authorized to make it 4½, if in your best judgment to do so." Devlin accordingly, after a failure to induce the payment of higher interest, telegraphed to W. E. Hutton & Co.: "Will accept Carlisle loan at 4½." Devlin then telegraphed and wrote to Welch, saying: "Have accepted Cincinnati loan at 4½. Please forward papers to Harmon, Colston, Goldsmith & Hoadly." On July 21, 1896, a meeting of the finance committee of the defendant was held, at which the application for the loan was approved, and the action indorsed upon the application as above. The application was then sent to Harmon, Colston, Goldsmith & Hoadly, with a letter of instructions, in which that firm was directed, if satisfied with condition of the title, to return the application, indorsed over their signature, "Title approved ready for the money." On August 19th, Harmon, Colston, Goldsmith & Hoadly returned the application, indorsed over their signature, "Title approved ready for the money. Applicants desire only $176,000." They accompanied this indorsement with a letter, in which they pointed out certain apparent defects in the title, but said that, in their judgment, the title was good of record; and further stated that, by direction of plaintiffs, they had prepared the bond and mortgage for only $176,000. On receipt of this, August 22d, Welch telegraphed Harmon, Colston, Goldsmith & Hoadly that the report would have to be submitted to the finance committee on the next Tuesday. Thereafter, on the 25th, he further telegraphed: "Finance committee regards defects cited by you on Carlisle title to be so objectionable as to warrant it in declining to consummate the loan." This was confirmed by letter. The plaintiffs were notified of this action. Thereafter they attempted to get the money elsewhere, and finally borrowed $172,000 from the Northwestern Mutual Life Insurance Company, for five years, at 5 per cent. Thereupon plaintiffs brought suit to recover damages, and in their amended petition averred as follows: "That on or about the 17th day of July, 1896, said defendant entered into a contract with plaintiffs, by which it agreed to lend them the sum of one hundred and eighty thousand ($180,000) dollars, at 4½ per cent. interest per annum, payable semiannually, for the term of five years, to be secured by the bond of the plaintiffs and their mortgage deed upon the

property of plaintiffs situated at the southeast corner of Fourth and Race streets, in the city of Cincinnati, being ninety-six (96) feet in front on Fôurth street, and extending back one hundred and fifty (150) feet to Baker street, known as the 'St. Nicholas Hotel Property.' * * * Plaintiffs agreed to pay all legal expenses for the examination of the title, and to furnish a complete abstract. That said defendant selected as its counsel for the purpose of making said examination the firm of Harmon, Colston, Goldsmith & Hoadly, of Cincinnati, Ohio, and agreed that it would accept their certificate of title."

It was contended by the plaintiffs below that the contract included a term that the parties should leave to the firm of Harmon, Colston, Goldsmith & Hoadly the question whether the title was good, and should be bound by their certificate. This term was sought to be proven by the language of Devlin in a letter dated July 14th, in which he expressed a preference for the firm of Harmon, Colston, Goldsmith & Hoadly, and said that he had, therefore, sent word to Mr. Carlisle that the company would accept their certificate of title. Mr. Carlisle was the agent of the plaintiffs in the negotiations for the loan. The court below held, however, that the contract did not include an agreement to abide by the certificate of Harmon, Colston, Goldsmith & Hoadly. It held that under the contract the plaintiffs were pledged to furnish a marketable title, and, upon the evidence, decided that such title had been furnished. The only defects in the title relied on are referred to in the letter of Harmon, Colston, Goldsmith & Hoadly to the Life Insurance Company, accompanying their certificate, under the fourth paragraph, which is as follows: "(4) In addition, there are two mortgages made by Charles Stetson to the Ohio Life Insurance & Trust Company, abstract, pages 43 and 53. These mortgages are not canceled of record, but they have long since been barred by the statute of limitations; in addition to which the Ohio Life Insurance & Trust Company failed, in the year 1857, and in the fall of that year, or early in the year 1858, Mr. James P. Kilbreth became trustee for the benefit of the creditors of that company. Mr. Kilbreth continued in the performance of his duties as trustee for upwards of thirty years, and in all that time took no steps whatever to enforce either of these mortgages. The presumption is, they had been fully paid and satisfied, although not canceled of record. They cannot now be canceled of record, for Mr. Kilbreth has and had no authority to cancel a mortgage which was evidently paid before the failure of the company, and no officer of the company now exists who would have the authority to do any act on behalf of the company, although Mr. S. P. Bishop, last secretary of the Ohio Life Insurance & Trust Company, is still living; and we have no doubt that both of those gentlemen would join in any statement to the effect that they believe both of these mortgages were paid, but we do not consider that such statement would add anything whatever to the presumption arising from the facts already stated. We may add that for fifteen or twenty years we were counsel for Mr. Kilbreth as trustee of the Ohio Life Insurance & Trust Company, and that while we were his counsel we never heard a suggestion of any step to enforce these mortgages, so that these mortgages also, although not canceled of record, do not, in our judgment, affect the title to this property." The only evidence of these mortgages is to be found in the abstract which was furnished by the plaintiff to Harmon, Colston, Goldsmith & Hoadly, and introduced in evidence. The references are as follows:

"Charles Stetson
    "to
"Ohio Life Insurance Company.
        "Mortgage Book 115, page 467.
        "Mortgage dated March 8, 1847.
        "Recorded March 16, 1847.

"This mortgage covers 61 feet on the south side of Fourth street, in the city of Cincinnati, Ohio, by 150 feet in depth along the east side of Race street to Burnet street.

"Secures the payment by Charles Stetson and Rebecca R., his wife, to the Ohio Life Insurance & Trust Company, of the sum of $10,000, according to the tenor of a certain promissory note bearing date January 9, 1847, drawn by said Charles Stetson in favor of Josiah Lawrence, and by him assigned to said the Ohio Life Insurance & Trust Company for the sum of $10,000, and for

any renewal or renewals of the same; and also the premium that may be paid for the further security of the above sum of money, with interest as aforesaid, by the Ohio Life Insurance & Trust Company, for insurance on the same premises of any sum of money not exceeding $10,000.

"Duly executed.

"On the margin of the record of this mortgage appears the following:

" 'Release of a lot on the south of Fourth street, 24 feet 6 inches eastwardly from Race street, and running thence eastwardly with Fourth street 36 feet 6 inches, and extending back southwardly, the same width, on lines parallel with Race street, 150 feet to Burnet street. Recorded Book 123, page 63.'

"Also the following:

" 'The Ohio Life Insurance & Trust Company, Cincinnati, 18th January, 1849. The debt within mentioned and secured has been paid. This mortgage is therefore satisfied, and hereby canceled, and the recorder of Hamilton ——is authorized and requested to enter the same of record.

" 'Entered of record 18th January, 1849.

" 'Th. Heckewelder, Recorder.'

"Note. The above cancellation is unsigned by the mortgagee.

"Chas Stetson,

"to

"The Ohio Life Insurance & Trust

Company.

"Mortgage Book 135, page 612.

"Mortgage dated January 18, 1849.

"Recorded January 18, 1849.

"This mortgage covers a lot at the southeast corner of Fourth and Race streets, in Cincinnati, described as follows: 'Commencing at the southeast corner of Fourth and Race streets, and running thence eastwardly with the south line of Fourth street 24 feet 6 inches; thence southwardly, on a line parallel with Race street, 124 feet; thence eastwardly, parallel with Burnet street, 4 feet 6 inches; thence southwardly, parallel with Race street, 26 feet, to Burnet street; thence westwardly with the north line of Burnet street 29 feet, to Race street; and thence northwardly with the east line of Race street 150 feet, to the place of beginning.'

"Secures the payment by Charles Stetson and Rebecca, his wife, to the Ohio Life Insurance & Trust Company, of the sum of $15,000 and interest from the date hereof, until paid at the rate of seven per cent. per annum, according to the tenor of a certain promissory note of even date, drawn by the said Charles Stetson, and payable to the Ohio Life Insurance & Trust Company, or order; and also premium that may be paid for the further security of the above sum of money, with interest aforesaid, by the Ohio Life Insurance & Trust Company, for insurance on the said premises of any sum of money not exceeding $5,000.

"Duly executed by said Stetson and wife.

"This mortgage is uncanceled of record."

The defendant denied the making of the contract. The court below found that there was a contract, and directed the jury to return a verdict fixing the damages at one-half per cent. interest on the amount loaned for five years and the cost of a re-examination of the title in the negotiation of the loan by the Northwestern Mutual Life Insurance Company. A verdict was accordingly rendered for $4,536.

George Hoadly, Jr., for plaintiff in error.

John C. Healy, for defendants in error.

Before TAFT and DAY, Circuit Judges.

TAFT, Circuit Judge (after stating the facts as above). It is contended on behalf of the insurance company that no contract to make the loan is shown. We think it clear that the application for the loan, and the approval of it by the finance committee, who, it is conceded, had full power to make the loan, is quite enough to show

a complete·contract. It is argued that Devlin, who telegraphed Carlisle's brokers that the loan was accepted, had no authority to make the loan, and that the vice president, who authorized Devlin to send the telegram, had no such authority; but it is not and cannot be denied that the finance committee, a majority of whom appended their names to the written approval of the application for the loan, had such authority. It is insisted that the application was not a proposal to take the loan, but only part of the negotiation leading up to it. We do not so read the instrument. It is called an application for loan. It is intended to embody the terms of a contract to take and to make a loan, and. when approved by the company, becomes, in our judgment, a completed contract, by which the applicants agreed to take·the loan on the basis of the representations contained in the application, and the insurance company agreed to make the loan. This renders it unnecessary to inquire what the authority of Devlin or of Welch was in respect of the making of loans for the insurance company.

Nor is it material whether a term was added to the contract, by which the title of the land to be mortgaged should be finally submitted to the certificate of Harmon, Colston, Goldsmith & Hoadly, for the reason that we agree with the judgment of the judge on the circuit that the title here tendered was marketable. The only defects were two uncanceled mortgages of record; one dated March 8, 1847, to secure the payment of a note for $10,000, made by Stetson, then the owner of the land, in favor of Lawrence, and by him assigned to the Ohio Life Insurance & Trust Company. A cancellation of this mortgage is entered upon the record, but the cancellation is not signed by the mortgagee. The second mortgage is from the same mortgagor to the same mortgagee, dated January 8, 1849, and recorded January 8, 1849. Its condition of the defeasance was the payment of a note for $15,000 at the rate of seven per cent. The evidence does not show how long these notes were to run, and we are left to infer that they were demand notes. The second mortgage is given upon the same day upon which the first mortgage was canceled. It is proven that the plaintiffs and their ancestor from whom the property was inherited have been in constant possession, as the owners of the property, for more than 21 years prior to the date of the application for the loan. These mortgages were, therefore, at the date of the application of the loan, 49 and 47 years old, respectively, and, so far as is shown, the notes became barred by the statute of limitations in 15 years after the dates of the two mortgages, to wit, in '62 and '64. It is contended, however, that because, in Ohio, a mortgage conveys the legal title, and an action of ejectment may be brought upon condition broken, the barring of the notes does not remove the defect of the title. It is argued that the possession of the mortgagor after condition broken is not adverse to that of the mortgagee, and, consequently, that in Ohio the right of ejectment on a mortgage deed is never barred, and the statute of limitations does not begin to run on it unless the mortgagor shall have taken some affirmative step to repudiate the title of the mortgagee, and brought it to the latter's notice. Allen v. Everly, 24 Ohio St.

97.   Conceding this statement of the law of Ohio to be true, it still does not follow that these uncanceled mortgages are such a cloud upon the title, or a defect in it, as to render the title unmarketable. It is clear that the statute of limitations has barred the notes which these mortgages were given to secure, because, under the law of Ohio, suit upon a written instrument is barred in 15 years, and these notes, we must infer from the evidence, were demand notes, and due immediately after they were executed and delivered.   The right of foreclosure upon the mortgages was also barred within the same time.   Kerr v. Lydecker, 51 Ohio St. 240, 37 N. E. 267, 23 L. R. A. 842.   It is well settled that, in the absence of proof to the contrary, there is a presumption of fact that after 20 years a note secured by mortgage has been paid, and the mortgage satisfied.   Hughes v. Edwards, 9 Wheat. 488, 6 L. Ed. 142; Downs v. Sooy, 28 N. J. Eq. 55; Jackson v. Wood, 12 Johns. 242; Inches v. Leonard, 12 Mass. 379; Howland v. Shurtleff, 2 Metc. (Mass.) 26; Jackson v. Pratt, 10 Johns. 380; 2 Wood, Lim. 229.   The longer the time, the stronger the presumption.   It is now 51 years since the later of the two mortgages and notes was executed.   In addition to this presumption, we must consider the further circumstance that these notes were due to the Ohio Life & Trust Company, which failed in the year 1857, and was placed in the hands of a trustee for the benefit of creditors, whose duty it was to collect all debts due to the company; that the trustee continued in the performance of his duties as trustee for 30 years, and in all that time took no steps whatever to enforce either of these mortgages.   Under these circumstances it admits of no doubt as a question of fact that the mortgages were satisfied.   The Ohio Life & Trust Company was a banking and trust company engaged in the business of loaning money and collecting it.   It is inconceivable that a debt of $10,000, or a debt of $15,000, should escape the attention of its officers, and action not be taken by them to enforce the same.   When afterwards a trustee was appointed, giving bond for the proper performance of his duty under the control of the court, we think an objection based on the remote possibility that the debt was not paid must be regarded as fanciful, and lacking the slightest weight.   We are supported in this conclusion not only by the judgment of the counsel for the insurance company at the time of the examination of the title, but also by the decision of the supreme court of Ohio in the case of Rife v. Lybarger, 49 Ohio St. 422, 31 N. E. 768, 17 L. R. A. 403, which, though it differs in some respects from the case in hand, presents a close analogy to it.   It was an action for the specific performance of a contract to sell land, and the implied term of the contract was held to be that the title should be marketable.   The vendor showed a good title in every respect, except that there was a mortgage uncanceled of record securing certain promissory notes of even date. The mortgage notes were given to the ancestor of the vendors, and the notes and mortgage could not be found in his possession.   The next of kin of the mortgagees executed a release after the death of the mortgagee, who lived more than 12 or 15 years beyond the time of the execution of the mortgage and note.   Objection was made

to the title on the ground that the mortgagee might have assigned the notes and mortgage, and they might be outstanding in the hands of some third person. It was held that, while this was a possibility, the presumption of payment was so strong from the other circumstances that it did not make any substantial defect in the title. These views lead us to concur in the action of the court below, and to an affirmance of its judgment, with costs.